**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| **QBE INSURANCE** | ) | |
| **CORPORATION,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO.:10-0456-CG-N** |
| | ) | |
| **ESTES HEATING & AIR** | ) | |
| **CONDITIONING, INC.** | ) | |
| | ) | |
| **Respondent.** | ) | |

<u>**MEMORANDUM OF LAW IN SUPPORT OF QBE INSURANCE CORPORATION'S
MOTION FOR SUMMARY JUDGMENT**</u>

COMES NOW Petitioner QBE Insurance Corporation (hereinafter referred to as "QBE"),

pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rules 7.1 and 7.2 of the

United States District Court for the Southern District of Alabama, and submits this Memorandum

of Law in Support of its Motion for Summary Judgment. QBE offers the following in support of

its requested relief:

**A.     DISCUSSION**

     **i.     Alabama Courts Have Set Out Clear Guidelines for Interpretation of
Insurance Contracts, Which Is a Question of Law in Alabama.**

In *Twin City Fire Insurance. Co. v. Alfa Mutual Insurance Co.,* 817 So. 2d 687, 691-92

(Ala. 2001), the Alabama Supreme Court summarized the law in Alabama governing

interpretation of insurance contracts:

> A contract of insurance, like other contracts, is governed by the general
> rules of contracts. *Pate v. Rollison Logging Equip., Inc*., 628 So. 2d 337
> (Ala.1993). Insurance companies are entitled to have their policy contract
> enforced as written. *Gregory v. Western World Ins. Co*., 481 So. 2d 878
> (Ala.1985). "Insurance contracts, like other contracts, are construed so as to give
> effect to the intention of the parties, and, to determine this intent, a court must
> examine more than an isolated sentence or term; it must read each phrase in the

context of all other provisions." *Attorneys Ins. Mut. of Alabama, Inc. v. Smith, Blocker & Lowther, P.C.,* 703 So. 2d 866, 870 (Ala.1996).

If an insurance policy is clear and unambiguous in its terms, then there is no question of interpretation or construction. *American & Foreign Ins. Co. v. Tee Jays Mfg. Co.,* 699 So. 2d 1226 (Ala.1997). The fact that the parties interpret the insurance policy differently does not make the insurance policy ambiguous. *Tate v. Allstate Ins. Co.,* 692 So. 2d 822 (Ala.1997). While ambiguities or uncertainties in an insurance policy should be resolved against the insurer, ambiguities are not to be inserted by strained or twisted reasoning. *Kelly v. Royal Globe Ins. Co.,* 349 So. 2d 561 (Ala.1977). Where the parties disagree on whether the language in an insurance contract is ambiguous, a court should construe language according to the meaning that a person of ordinary intelligence would reasonably give it. *Western World Ins. Co. v. City of Tuscumbia,* 612 So.2d 1159 (Ala.1992).

Where an insurance policy defines certain words or phrases, a court must defer to the definition provided by the policy. *St. Paul Fire & Marine Ins. Co. v. Edge Mem'l Hosp.,* 584 So.2d 1316 (Ala.1991). . . . An undefined word or phrase in an insurance policy does not create an inherent ambiguity. To the contrary, where questions arise as to the meaning of an undefined word or phrase, the court should simply give the undefined word or phrase the same meaning that a person of ordinary intelligence would give it. *Carpet Installation & Supplies of Glenco v. Alfa Mut. Ins. Co.,* 628 So.2d 560 (Ala.1993).

*Twin City,* 817 So. 2d at 691-692.

Further, the Alabama Supreme Court "has held that an insurance company has the right to limit its liability and write a policy with narrow coverage but that, when doubt exists as to whether an insurance policy provides coverage, the language used by the insurer must be construed liberally for the benefit of the insured and strictly against the insurance company." *Turner v. State Farm Fire & Cas. Co.,* 614 So. 2d 1029 (Ala. 1993).

Regarding policy exclusions, "[t]he law in Alabama is clear that insurance companies have the right, in the absence of statutory provisions to the contrary, to limit their liability and write policies with narrow coverage; the insured has the option to purchase the policy or look elsewhere . . . .  It is also true that the courts must enforce insurance contracts as written  . . . ." *Aetna Ins. Co. v. Pete Wilson Roofing & Heating Co.,* 289 Ala. 719, 723, 272 So. 2d 232 (1972).

Regarding endorsements, the Alabama Supreme Court has also clarified that "endorsements" to insurance policies are provisions added to an insurance contract altering its scope or application that take precedence over printed portions of the policy in conflict therewith. *Commercial Standard Ins.Co. v. Gen. Trucking Co.,* 423 So. 2d 168 (Ala. 1982).

### ii.      Duty to Defend Standard

The standard of review when determining whether an insurer owes its insured a duty to defend is well established:

> "Whether an insurance company owes its insured a duty to provide a defense in proceedings instituted against the insured is determined primarily by the allegations contained in the complaint." *Tanner v. State Farm Fire & Cas. Co.,* 874 So.2d 1058, 1063 (Ala.2003). Under Alabama law, "[i]f the allegations of the injured party's complaint show an accident or occurrence which comes within the coverage of the policy, the insurer is obligated to defend regardless of the ultimate liability of the insured." *Gunnin v. State Farm and Cas. Co.,* 508 F.Supp.2d 998, 1002 (M.D.Ala.2007) (citation omitted). However, a court is not constrained to consider only the allegations of the underlying complaint, but may additionally look to facts which may be proved by admissible evidence. *Tanner,* 874 So.2d at 1064; *see also Hartford Cas. Ins. Co. v. Merchants & Farmers Bank,* 928 So.2d 1006, 1010 (Ala.2005) (in deciding whether the allegations of the complaint show a covered accident or occurrence, "the court is not limited to the bare allegations of the complaint ... but may look to facts which may be proved by admissible evidence") (citations omitted). The test, ultimately, is this: "The insurer owes no duty to defend only if neither does the complaint against the insured allege a covered accident or occurrence nor does the evidence in the litigation between insurer and insured prove a covered accident or occurrence." *Tanner,* 874 So.2d at 1065.

*Essex Ins. Co. v. Foley*, Civil Action No. 10–0511–WS–M 2011 WL 1706214, 3 (S.D. Ala., May 5, 2011).

"It is well-established under Alabama law that 'the insured bears the burden to establish coverage by demonstrating that a claim falls within the policy, while the insurer bears the burden to prove that any policy exclusion applies.' " *Auto-Owners Ins. Co. v. L. Thomas Dev., Inc.*, Civ. Action No. 2:07cv1041-MHT, 2010 WL 2308190, *3 (M.D. Ala. June 9, 2010) (Thompson, J.)

(citing *Thorn v. Am. States Ins. Co.,* 266 F. Supp. 2d 1346, 1349 (M.D. Ala. 2002) (Thompson, J.)). "To ascertain whether [the insurer] owes [the insured] a duty to defend, the court focuses on the factual allegations in the complaint, not on the legal theories asserted." *Cotton States Mut. Ins. Co. v. Daniel*, 2008 WL 4999097, 6 (M.D. Ala., Nov. 20, 2008)  (citing *Hartford,* 928 So. 2d at 1011).

> Where facts are alleged in the complaint to support a cause of action, it is the facts, not the legal phraseology, that determine whether an insurer has a duty to defend its insured in the action. As we have said: "[I]f there is any uncertainty as to whether the complaint alleges *facts* that would invoke the duty to defend, the insurer must investigate the *facts* surrounding the incident ... to determine whether it has a duty to defend...."

*Hartford, supra,* at 1012. (citing *Acceptance Ins. Co. v. Brown,* 832 So.2d at 14) (quoting *Blackburn v. Fid. & Deposit Co. of Maryland,* 667 So. 2d 661, 668 (Ala.1995) (emphasis original)).

### iii. No Coverage is Afforded to Estes for the Underlying Suit Because there has been no "Occurrence" as to the Work Performed by Estes.

#### (a) There is no Accident, Thus no "Occurrence", Which Caused "Bodily Injury" or "Property Damage" to the Underlying Suit Plaintiffs.

The QBE CGL Policy provides coverage for "bodily injury" and/or "property damage caused by an "occurrence". An "occurrence" is defined in the Policy as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Though the word "accident" is not defined in the Policy, Alabama courts have held, "[t]he term accident means 'an unintended and unforeseen injurious occurrence; something that does not occur in the usual course of events or that could be reasonably anticipated' or 'something unforeseen, unexpected, or unusual.'" *U.S. Liability Ins. Co. v. Sternenberg Constr.*, Civ. Action No. 2:10-cv-374-MEF, 2011 WL 3585261, *6 (M.D. Ala., August 16, 2011) (Fuller, M.) (quoting *Hartford, supra) See also Auto Owners, supra.* Therefore, when making a determination as to whether an

event is an "occurrence", this Court "must consider whether the insured **expected or intended the conduct** alleged in the underlying complaint. *Id.* (citing *Auto Owners*, 2010 WL 2308190 at *3) (emphasis added).

With regard to review of the underlying complaint, it "must contain factual allegations to support legal causes of action within the scope of the policy's coverage; it is not enough for an insured to rely on bare legal conclusions without factual support to establish the underlying claims are within the scope of the insurance coverage." *Id.*  Additionally, if it is unclear whether the factual allegations in the underlying complaint answer the coverage question, a court may consider facts outside the complaint as long as they are proven by admissible evidence. *Id.*

Here, neither the factual allegations in the Underlying Suit Complaint nor the facts discovered outside the Complaint state an "occurrence" within the policy as there is no allegation or evidence that an accident occurred during Estes' performance. There are no allegations, nor is there any evidence, that Estes' conduct in installing the HVAC systems was anything other than the way Estes intended and expected to install them.

The underlying Complaint alleges facts collectively as to all defendants, that said "[d]efendants manufactured, formulated, designed, processed, distributed, delivered, imported, supplied, inspected, tested, marketed, sold, warranted, advertised, used, installed, applied, serviced and/or failed to warn concerning an inadequate, defective and miss-sized HVAC system in the Plaintiffs' home." [Ex. A, ¶26]. As to negligent conduct, the Complaint alleges legal conclusions that the defendants collectively breached a duty owed to the Plaintiffs to "exercise reasonable and ordinary care in the manufacture, formulation, design, processing, distribution, delivery, importation, supplying, inspection, testing, marketing, sale, warranting, advertising, use, installation, application, servicing and/or warnings concerning the Chinese drywall and the

HVAC system" and "further failed to warn the Plaintiffs and others of the defective nature of the Chinese drywall and HVAC system . . . ." [Ex. A, ¶¶35, 36].

In this instance, it is unclear whether the factual allegations in the Underlying Complaint answer the coverage question because the Complaint is patently vague and does not allege any conduct specific to Estes nor explain in what manner Estes' performance could have been negligent. Therefore, a coverage determination cannot be made regarding whether there is an alleged accident or "occurrence" by a simple reading of the Complaint. Because of this, the Court should look to the facts outside the Complaint to make such a determination.

A review of the facts outside the Complaint show that there has been no accident in this case as to Estes' conduct, and therefore there can be no "occurrence". Specifically, review of the subcontract agreement between Estes and general contractor The Mitchell Company, the investigation report and the Insured's testimony show that Estes did nothing other than strictly comply with the subcontract agreement by installing the exact number and size HVAC systems it was instructed to in the agreement and as called for in the specifications prepared by Creative Designs, the architect for the project. [Ex B, ¶10; Ex. C, Bates #Estes 206; Ex. D, Bates #Estes 108-09; Ex. E, pp. 13-15, 45-46, 66-67, 94]. The subcontract provides as follows:

ARTICLE I - Subcontractor shall furnish all labor and/or materials and perform all work necessary to complete the part or parts of the work described on Exhibit "A" attached hereto, herein referred to as the "Scope of Work".

Exhibit "A"

SCOPE OF WORK
Bessemer Family Sales
Estes Heating and Air Conditioning, Inc.
HVAC
15-120

Furnish all labor, material, equipment and supplies to install a complete, fully functioning heating and cooling system as described in project specifications and indicated on project plans by Creative Designs sheets A1-A21 and M1-M10. The equipment shall consist of 36 condensing units, and 36 air handlers (3 ton units) as shown on the attached Payment Schedule and Equipment Specifications.

[Ex. C, Bates #Estes 201, 206].

Based on the above facts, it is clear that Estes was merely instructed by The Mitchell Company on exactly the number and size of units to install in the Bessemer Subdivision and performed that job as it intended to do. According to Estes, it "did not compute the HVAC system load calculations," rather those were given to it by The Mitchell Company. [Ex. D, Bates #Estes 108-09]. According to the subcontract agreement, the systems to be installed by Estes were those "as described in project specifications and indicated on project plans by Creative Designs Sheets A1-A21 and M1-M10. [Ex. C, Bates #Estes 206]. Estes holds the opinion that "the units were of appropriate size and design to perform the task they were intended, explaining that the mechanical engineers specifications concurred with what he would have installed in the homes." [Ex. D, Bates #Estes 108-09]. Had Estes done something during the process of installing the HVAC systems, such as, for example, making an error in calculation resulting in the wrong size units being installed, then there may exist grounds for the finding of an accident. *See e.g. Cook v. Admiral Ins. Co.*, Civil Action No. 10-10722, 2011 WL 3652590, *3 (5th Cir. Aug. 19, 2011) (Under CGL Policy with definition of "occurrence" identical to that in QBE Policy, a mistake in counting amount of casing needed for oil well was accident under Texas law which defined accident as a fortuitous, unexpected, and unintended event," similar to Alabama definition of accident). However, under these facts, there is no such alleged error or mistake on the part of Estes, therefore there is no accident, and thus no "occurrence."

Even though there is no "occurrence" with regard to Estes' conduct, QBE does recognize the possibility that there has been an "occurrence" in this case, at least as to the party that installed the Chinese drywall. While QBE can find no law in Alabama specifically stating that the "property damage" and "bodily injury" caused by the off-gassing from Chinese drywall is

caused by an "occurrence", other jurisdictions have reached the conclusion that when sulfide gases emitted from Chinese drywall cause damage to persons or property other than the drywall itself, there has been an "occurrence". Specifically, other jurisdictions have held that while damages to the drywall itself do not constitute an "occurrence", damages resulting from emissions from the drywall are accidental and thus "occurrences". *See Dragas Mgmt. Corp. v. Hanover Ins. Co.*, 2011 WL 2982097, *4 (E.D.Va., July 21, 2011) ("Therefore, under the Fourth Circuit's precedent, this court holds that the replacement of the defective drywall is not an occurrence under the policy; however, any repair or replacement of non-defective components of the homes at The Hampshires and Cromwell Park or personal property of the homeowners constituted an occurrence under the Citizens policies at issue."); *In re Chinese Manufactured Drywall Prod. Liab. Litig.*, 759 F. Supp. 2d 822, 835 (E.D. La. 2010) ("the Court finds that the damage caused by Chinese drywall in the homes of Plaintiffs' insured under ASI Lloyds and Allstate's homeowners' policies constitutes covered "accidental," "sudden," "physical," "loss."); *Builders Mut. Ins. Co. v. Dragas Mgmt. Corp.*, 709 F. Supp. 2d 441, 446 (E.D. Va. 2010) (allegations of damage to "other building components of homes at the Developments and personal property in those homes" sufficient to allege "occurrence" such that motion to dismiss was denied).

Nevertheless, because there is no allegation or evidence that Estes had anything to do with the manufacture, procurement or installation of the drywall, there can be no "occurrence" as to the work done by Estes. According to the Complaint, "Estes Heating & Air, Inc. supplied, installed and serviced the HVAC system in the Plaintiffs' homes." [Ex. A, ¶12]. Conversely, defendants Mitchell Company, Inc., Interior-Exterior Building Supply Company, L.P., Creola Ace Hardware, Inc., Rightway Drywall, Inc., Smokey Mountain Materials, Inc., George Drywall,

Inc., Knauf USA Polystyrene, Inc., and Knauf Insulation GMBH were the parties involved with the sales, marketing, distribution, installation, etc. of the defective Chinese drywall. [Ex. A, ¶18]. In fact, Estes confirmed that its installation of the HVAC systems had nothing to do with the installation of the drywall. [Ex. D, Bates #Estes 110].

> **(b)** **There is no Coverage for Repair or Replacement of the HVAC Systems Themselves Because any Damage to Those Would be the Result of Estes' Faulty Workmanship, Which is not an "Occurrence" Under Alabama Law.**

Under Alabama law, faulty workmanship of either a general contractor or a subcontractor on behalf of an insured does not constitute an "occurrence." Accordingly, there is no coverage for faulty workmanship claims under commercial general liability policies. *See U.S. Fid. & Guar. Co. v. Warwick Dev. Co., Inc.*, 446 So. 2d 1021 (Ala. 1984) (Faulty workmanship does not constitute and "occurrence") (*See also Berry v. South Carolina Ins. Co.,* 495 So. 2d 511 (Ala. 1985); *U.S. Fid. & Guar. Co. v. Bonitz Insulation Co. of Ala.,* 424 So. 2d 569 (Ala. 1982).

Citing both *Bonitz* and *Berry*, in June of 2010 the United States District Court for the Middle District of Alabama again recognized that faulty workmanship claims are not covered claims under CGL policies in *Auto Owners, supra*. In that case, Judge Myron Thompson held that there was no coverage for the faulty workmanship performed by a general contractor hired to build a home for the homeowners when the foundation was negligently installed causing resulting damage to the rest of the home. Holding that the entire home was the general contractor's work product, the Court interpreted policy provisions identical to those in the QBE CGL Policy and explained that these provisions meant that "faulty workmanship is explicitly not covered" under the CGL policy. *Id.* at *4. The Court further reaffirmed that this finding was "in line with the pervasive legal understanding of general-liability insurance, the purpose of which is to protect the insured against accidents, unforeseen disasters, and the misfeasance of others, such

as subcontractors; it is not intended to make the insurance company a guarantor of the insured's work." *Id.* at *5. (citing *Auto-Owners Ins. Co. v. Toole*, 947 F.Supp. 1557, 1564 (M.D. Ala. 1996)).

Likewise, the Eleventh Circuit Court of Appeals has recently held that several subcontractors' faulty workmanship did not constitute an "occurrence" under a commercial general liability policy and therefore any damage resulting from that faulty work was not covered. *Hathaway Dev. Co. v. Illinois Union Ins. Co.,* 274 Fed. App'x. 787 (11th Cir. 2008). In *Hathaway*, the Court reviewed de novo the grant of summary judgment by the federal district court for the insurer, Illinois Union Insurance Co., against the insured, Hathaway Development Co. ("Hathaway"), in a case where Hathaway sought to recover its construction costs of repair for faulty workmanship performed by subcontractors on three separate apartment complex projects. *Id.* at 789. Hathaway raised several issues on appeal.

Of primary importance to the instant case, Hathaway argued that the district court had erred in determining that there was no "occurrence" as that term was defined in the policy. *Id.* at 791. The terms of the commercial general liability policy in *Hathaway* provided that the insurance applied "to 'bodily injury' and 'property damage' only if . . .[t]he 'bodily injury' or 'property damage' is caused by an 'occurrence' . . ."*Id.* The policy further defined "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful condition." *Id.* Upon review, the Eleventh Circuit agreed with the grant of summary judgment by the district court, affirming the decision on the reasoning that the subcontractors' faulty workmanship was 'an injury accidentally caused by intentional acts.' *Id. Quoting Owners Ins. Co. v. James,* 295 F. Supp. 2d 1354, 1364 N.D. Ga. 2003). The work therefore did not constitute an accident under the policy language, could not then be an

"occurrence" under that definition and any damage resulting from that faulty workmanship was not covered.  *Id.*

The language in the subject QBE Policy at issue in the instant case is identical to the language as cited in *Hathaway* above.  The definition of "occurrence" in the QBE Policy therefore requires that there be an accident before there can be an "occurrence" such that coverage is triggered.  The allegations made by the Plaintiffs in the Underlying Suit pertain only to the faulty workmanship of Estes in installing HVAC systems that were of improper size.  There is no accident alleged such that there would be an "occurrence" under the Policy, only at best "an injury accidentally caused by intentional acts" as referenced in *Hathaway*, and pursuant to *Hathaway* there is no coverage under such a fact scenario.

Based upon the foregoing, there is no coverage for either the repair or replacement of Estes' work associated with the allegedly inadequately sized HVAC units as those damages would constitute faulty workmanship and thus are not caused by an "occurrence" under the QBE Policy.

    **iv.**    **The Total Pollution Exclusion Applies to Bar Coverage for all Claims Due to the Discharge, Dispersal or Release of Sulfide Gases from Allegedly Defective Chinese Drywall.**

The subject QBE policy issued to Estes contains what has become known nationwide, according to its name, as "The Total Pollution Exclusion." It states as follows:

This insurance does not apply to:
f.    Pollution
    (1)    "Bodily injury" or "property damage" which would not have occurred in whole or in part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants"[1] at any time.
    (2)    Any loss, cost or expense arising out of any:
        (a)    Request, demand, order or statutory or regulatory requirement that any

---

[1] The alleged "pollutant" in the underlying Complaint is Hydrogen Sulfide. Recent court decisions from other jurisdictions have held that Hydrogen Sulfide is a "pollutant." *See Wakefield Pork, Inc. v. Ram Mut. Ins. Co.*, 731 N.W.2d 154 (Mn. Ct. App. 2007) *United Nat. Ins. Co. v. Hydro Tank, Inc.*, 525 F.3d 400 (5th Cir. 2008).

> insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or
>
> (b)      Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

[Ex. F].

The scope of this exclusion has been repeatedly litigated and has spawned a national debate, from which have emanated conflicting judicial decisions throughout the country. *Apana v. TIG Ins. Co.*, 574 F.3d 679 (9th Cir. 2009) (*citing Porterfield v. Audubon Indem. Co.,* 856 So. 2d 789, 800 (Ala. 2002) ("[T]here exists not just a split of authority, but an absolute fragmentation of authority."). Two primary judicial schools of rationale have developed. Most State courts fall roughly into one of two broad camps. *Id.* According to the *Apana* court, the first group of courts applies the exclusion literally because they find the terms to be clear and unambiguous. *Id.*[2] The other group of courts has limited the exclusion to situations involving traditional environmental pollution, either because they find the terms of the exclusion to be ambiguous or because they find that the exclusion contradicts policyholders' reasonable

---

[2] *See Whittier Props., Inc. v. Ala. Nat. Ins. Co.,* 185 P.3d 84, 89-92 (Alaska 2008); *TerraMatrix, Inc. v. U.S. Fire Ins. Co.,* 939 P.2d 483, 487-88 (Colo. Ct. App.1997); *Heyman Assocs. No. 1 v. Ins. Co. of State of Pa.,* 231 Conn. 756, 653 A.2d 122, 129-33 (Conn. 1995); *Deni Assocs. of Fla., Inc. v. State Farm Fire & Cas. Ins. Co.,* 711 So.2d 1135, 1137-41 (Fla. 1998); *Reed v. Auto-Owners Ins. Co.,* 284 Ga. 286, 667 S.E.2d 90, 92 (Ga. 2008); *Bituminous Cas. Corp. v. Sand Livestock Sys., Inc.,* 728 N.W.2d 216, 220-22 (Iowa 2007); *McKusick v. Travelers Indem. Co.,* 246 Mich.App. 329, 632 N.W.2d 525, 529-32 (2001); *Auto-Owners Ins. Co. v. Hanson,* 588 N.W.2d 777, 779-81 (Minn. Ct. App. 1999); *Heringer v. Am. Family Mut. Ins. Co.,* 140 S.W.3d 100, 102-06 (Mo. Ct. App. 2004); *Sokoloski v. Am. W. Ins. Co.,* 294 Mont. 210, 980 P.2d 1043, 1044-45 (1999); *Cincinnati Ins. Co. v. Becker Warehouse, Inc.,* 262 Neb. 746, 635 N.W.2d 112, 118-21 (2001); *Bituminous Cas. Corp. v. Cowen Constr., Inc.,* 55 P.3d 1030, 1033-35 (Okla. 2002); *Madison Const. Co. v. Harleysville Mut. Ins. Co.,* 557 Pa. 595, 735 A.2d 100, 106-08 (1999); *S.D. State Cement Plant Comm'n v. Wausau Underwriters Ins. Co.,* 616 N.W.2d 397, 405-07 (S.D. 2000); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.,* 907 S.W.2d 517, 521-22 (Tex. 1995); *City of Chesapeake v. States Self-Insurers Risk Retention Group, Inc.,* 271 Va. 574, 628 S.E.2d 539, 541 (2006); *Peace ex rel. Lerner v. Nw. Nat'l Ins. Co.,* 228 Wis.2d 106, 596 N.W.2d 429, 438-46 (Wis. 1999).

expectations.[3] *See Porterfield, supra*. Other courts have expanded the scope of pollution excluded under the provision beyond traditional environmental pollution to include non-environmental claims involving pollutants. *Id.*[4]

Despite Alabama's inclusion in the group of states that have generally limited the

---

[3] See also *Keggi v. Northbrook Prop. & Cas. Ins. Co.,* 199 Ariz. 43, 13 P.3d 785, 790-92 (Ariz.Ct.App.2000); *Minerva Enters., Inc. v. Bituminous Cas. Corp.,* 312 Ark. 128, 851 S.W.2d 403, 404-06 (1993); *MacKinnon v. Truck Ins. Exch.,* 31 Cal.4th 635, 3 Cal.Rptr.3d 228, 73 P.3d 1205, 1208-18 (2003); *Danbury Ins. Co. v. Novella,* 45 Conn.Supp. 551, 727 A.2d 279, 281-83 (1998) (distinguishing *Heyman Assocs. No. 1 v. Ins. Co. of State of Pa.,* 231 Conn. 756, 653 A.2d 122 (1995), listed above); *Am. States Ins. Co. v. Koloms,* 177 Ill.2d 473, 227 Ill.Dec. 149, 687 N.E.2d 72, 75-82 (1997); *Am. States Ins. Co. v. Kiger,* 662 N.E.2d 945, 948-49 (Ind.1996); *Motorists Mut. Ins. Co. v. RSJ, Inc.,* 926 S.W.2d 679, 680-82 (Ky.Ct.App.1996); *Doerr v. Mobil Oil Corp.,* 774 So.2d 119, 125-28, 134-36 (2000); *Sullins v. Allstate Ins. Co.,* 340 Md. 503, 667 A.2d 617, 620-24 (1995); *W. Alliance Ins. Co. v. Gill,* 426 Mass. 115, 686 N.E.2d 997, 999-1001 (1997); *W. Am. Ins. Co. v. Tufco Flooring E., Inc.,* 104 N.C.App. 312, 409 S.E.2d 692, 697-98 (1991), *overruled on other grounds by Gaston County Dyeing Mach. Co. v. Northfield Ins. Co.,* 351 N.C. 293, 524 S.E.2d 558, 565 (2000); *Weaver v. Royal Ins. Co. of Am.,* 140 N.H. 780, 674 A.2d 975, 977-78 (1996); *Nav-Its, Inc. v. Selective Ins. Co. of Am.,* 183 N.J. 110, 869 A.2d 929, 932-39 (2005); *Belt Painting Corp. v. TIG Ins. Co.,* 100 N.Y.2d 377, 763 N.Y.S.2d 790, 795 N.E.2d 15, 18-21 (2003); *Andersen v. Highland House Co.,* 93 Ohio St.3d 547, 757 N.E.2d 329, 332-34 (2001); *Kent Farms, Inc. v. Zurich Ins. Co.,* 140 Wash.2d 396, 998 P.2d 292, 294-96 (2000); *Gainsco Ins. Co. v. Amoco Prod. Co.,* 53 P.3d 1051, 1062-66 (Wyo.2002).

[4] *See also Nascimento v. Preferred Mut. Ins. Co.*, 513 F.3d 273, 279 (1st Cir. 2008) (holding that pursuant to Massachussetts law, home heating oil which leaked from an underground storage tank was a "pollutant"); *Assicurazioni Generali, S.p.A. v. Neil,* 160 F.3d 997, 1005, 29 Envtl. L. Rep. 20324 (4th Cir. 1998); *American States Ins. Co. v. Nethery,* 79 F.3d 473, 477 (5th Cir. 1996); *St. Leger v. American Fire and Cas. Ins. Co.,* 870 F. Supp. 641 (E.D. Pa. 1994), judgment aff'd, 61 F.3d 896 (3d Cir. 1995); *Hartford Underwriter's Ins. Co. v. Estate of Turks*, 206 F. Supp. 2d 968, 977 (E.D. Mo. 2002); *Essex Ins. Co. v. Tri-Town Corp.,* 863 F. Supp. 38, 41 (D. Mass. 1994); *Cold Creek Compost, Inc. v. State Farm Fire and Cas. Co.,* 156 Cal. App. 4th 1469, 1482, 68 Cal. Rptr. 3d 216, 226 (1st Dist. 2007), review denied, (Feb. 20, 2008) (holding that odors which emanated from a composting facility constituted an environmental pollutant where the applicable exclusion's definition of a pollutant included a "gaseous … irritant or contaminant"); *Deni Associates of Florida, Inc. v. State Farm Fire & Cas. Ins. Co.,* 711 So. 2d 1135, 1138, 28 Envtl. L. Rep. 21069 (Fla. 1998); *McGregor v. Allamerica Ins. Co.,* 449 Mass. 400, 403, 868 N.E.2d 1225, 1227 (2007) (holding that home heating oil that leaked from a supply line during the installation of a furnace constituted a pollutant); *Heringer v. American Family Mut. Ins. Co.,* 140 S.W.3d 100, 105–106 (Mo. Ct. App. W.D. 2004); *Cincinnati Ins. Co. v. Becker Warehouse, Inc.,* 262 Neb. 746, 755, 635 N.W.2d 112, 119, 32 Envtl. L. Rep. 20360 (2001); *Matcon Diamond, Inc. v. Penn Nat. Ins. Co.,* 2003 PA Super 22, 815 A.2d 1109, 1112 (2003); *United Nat. Ins. Co. v. Hydro Tank, Inc.,* 497 F.3d 445 (5th Cir. 2007), opinion amended on denial of reh'g, 525 F.3d 400 (5th Cir. 2008) (Under Texas law, pollution exclusion clause applies whenever pollutant causes harm by physical mechanism enumerated in policy, irrespective of where injury took place or whether pollutant was released into environment); *Firemen's Ins. Co. of Washington, D.C. v. Kline & Son Cement Repair, Inc.,* 474 F. Supp. 2d 779, 796–99 (E.D. Va. 2007) (Pursuant to Virginia law, an unambiguous pollution exclusion clause which barred coverage for "discharge, dispersal, seepage, migration, release or escape" of pollutants was applicable where the insured properly applied a floor sealant in the normal course of business, resulting in toxic fumes that caused respiratory injuries to a person working in the same building, as the policy did not limit the exclusion to situations of traditional or environmental pollution); *Nautilus Ins. Co. v. Country Oaks Apartments*, Ltd., 556 F. Supp. 2d 611 (W.D. Tex. 2008) (Carbon monoxide emitting from a properly functioning furnace constituted a pollutant under an exclusion which unambiguously defined a pollutant as "any solid, liquid, gaseous, or thermal irritant or contaminant," and thus the insurer had no duty to defend the insured against a claim for an injury to an apartment resident from exposure to high levels of carbon monoxide fumes from the furnace which accumulated when a roof vent was blocked).

pollution exclusion to situations involving traditional environmental pollution via *Porterfield*, there is precedent where Alabama has deviated from that traditional notion of the pollution exclusion's intent. Specifically, in *Shalimar Contractors, Inc. v. American States Insurance Co.*, 975 F. Supp. 2d 1450 (M.D. Ala. 1997), the United States District Court for the Middle District of Alabama held that flaking lead paint was a "pollutant" which triggered the "Absolute Pollution Exclusion" such that coverage was excluded for a contractor whose work at the Riverside Heights housing project in Montgomery, Alabama had caused a child there to suffer lead poisoning. While it is true that five years later *Porterfield* examined and distinguished *Shalimar* in a similar fact scenario regarding flaking lead paint in the same Montgomery housing project, it is crucial to note the marked difference between the Absolute Pollution Exclusion interpreted in *Porterfield* and the Total Pollution exclusion in the case at bar. Specifically, the language of the "Absolute Pollution Exclusion" is much more limiting than that of the "Total Pollution Exclusion" found in QBE's Policy. The Absolute Pollution Exclusion from *Porterfield* stated that the insurance did not apply to:

"f.(1) 'Bodily injury' or 'property damage' arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants:
"(a) At or from premises you own, rent or occupy;
"(b) At or from any site or location used by or for you or others for the handling, storage, disposal, processing or treatment of waste;
"(c) Which are at any time transported, handled, stored, treated, disposed of, or processed as waste by or for you or any person or organization for whom you may be legally responsible; or
"(d) At or from any site or location on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations:
"(i) if the pollutants are brought on or to the site or location in connection with such operations; or
"(ii) if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize the pollutants.
"(2) Any loss, cost, or expense arising out of any governmental direction or request that you test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants.

As interpreted by the *Porterfield* Court, in order for the Absolute Pollution Exclusion to have been applicable, three elements must be present: "the bodily injury or property damage in question must have been caused by exposure to a 'pollutant'; that exposure must have arisen out of the actual, alleged, or threatened discharge, dispersal, release, or escape of the pollutant; and that discharge, dispersal, release, or escape must have occurred at or from certain locations or have constituted 'waste.'" 856 So.2d at 801. In comparison, QBE's Total Pollution Exclusion is much broader, requiring only two of those elements: "Bodily injury" or "property damage" "which would not have occurred in whole or in part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants' at any time." The requirement of a specific location of discharge, etc. of the "pollutant" as found in the Absolute Pollution Exclusion has been replaced with wording in the QBE Policy that the discharge of a pollutant "at any time" will trigger the Total Pollution Exclusion.

Regarding the newer language contained in QBE's Total Pollution Exclusion, though QBE could find no Alabama case interpreting this language, many courts from other jurisdictions have. As with the prior pollution exclusions, it seems there is a split of authority on the interpretation of this version of the pollution exclusion as well.[5] As stated above in footnote one

---

[5] *See Devcon International Corp. v. Reliance Ins. Co.*, 609 F.3d 214 (3rd Cir. 2010) (dust and other materials from airport runway construction job dispersed onto homes nearby were pollutants and identical pollution exclusion was interpreted to exclude coverage for contractor); *Nautilus Ins. Co. v. Country Oaks Apartments*, LTD, 566 F.3d 452 (5th Cir. 2009) (identical pollution exclusion added by amendment to CGL policy held to exclude coverage for carbon monoxide gas poisoning when too much carbon monoxide was dispersed into plaintiff's apartment causing injury); *First Specialty Ins. Corp. v. GRS Management Assc., Inc.*, 2009 WL 2524613 (S.D. Fla., Aug. 17, 2009) (identical pollution exclusions from two different insurance policies issued to same insured held to exclude coverage for health problems of child who became ill from ingesting pool water containing microbes); *Nova Cas. Co. v. Waserstein*, 424 F. Supp. 2d 1325 (S.D. Fla. 2006) (identical absolute pollution exclusion barred coverage for injuries to employees of tenant in office building who were injured by exposure to chemicals, microbes, etc. used and released during renovation work on building); *but see, cf. Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178 (6th Cir. 2000) (interpreting identical pollution exclusion, court determined that exclusion did not apply to situation where teacher was injured by fumes from chemical sealant used on floor above area where she was working); *Jones v. Francis Drilling Fluids, LTD.*, 642 F. Supp. 2d 643 (S.D. Tex 2009) (identical pollution exclusion and pollutant definition policy provisions did not exclude coverage for worker's injuries due to exposure to chemicals on board a tanker due to application of traditional Louisiana law holding that pollution exclusion clauses were designed to

of this memorandum, courts from other jurisdictions have held that sulfide gases such as those emitted, released, discharged, dispersed etc. from defective Chinese drywall do constitute "pollutants" as such were defined in their respective Policies. Under the QBE Policy, "pollutants" are defined, in pertinent part, as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes" etc. [Ex. F].

QBE strongly contends that there can be little debate that sulfide gases constitute "pollutants" as defined in the QBE Policy, especially with the supporting case law from other jurisdictions and the allegations made by the Underlying Suit Plaintiffs as to the "bodily injury" the gases have caused them. These gases which are emitted by the Chinese drywall are clearly a gaseous irritant or contaminant, whether the gas is classified as vapor, fumes or some other form of gas. Therefore, the only question for this Court to determine is whether the sulfide gases were effectively released, discharged, dispersed or escaped from the Chinese drywall in the Bessemer Subdivision residential housing such that the Total Pollution Exclusion would apply to bar coverage for Estes for all claims of "bodily injury" and "property damage" caused in whole or in part by the sulfide gases as alleged by the Plaintiffs in the Underlying Suit.

Another crucial distinction between *Porterfield* and the instant case is the *Porterfield* Court's intentional limitation on the application of its holding, specifically to the context of flaking and peeling lead paint in a residential apartment. 856 So. 2d at 806. *Porterfield* held, that in the context of peeling or flaking lead paint only, "the terms 'discharge,' 'dispersal,' 'release,' or 'escape' were ambiguous. *Id.* The instant case does not involve the peeling or chipping of lead paint, rather the dispersal, discharge, emanation, etc. of noxious sulfide gases. Therefore, the *Porterfield* decision does not prevent this Court from concluding that, under the specific facts

apply to environmental pollution only and cannot be applied to all contact with substances that may be classified as pollutants).

and circumstances of the instant case, sulfide gases emitted from Chinese drywall are "pollutants" that have been discharged, dispersed, released or could have escaped as those terms are included in the Total Pollution Exclusion Endorsement in QBE's Policy.

Based on the plain language of the Policy and the foregoing analysis, it is QBE's contention that the Total Pollution Exclusion in the Policy in unambiguous and clearly should apply to bar coverage for Estes for all claims such that QBE has no duty to defend or indemnify Estes for the same.

**v.    There is no Coverage for the Alleged Negligence in Count I of the Underlying Suit Because the Complaint only Alleges Expected or Intended Injury.**

In Count I, the Complaint alleges that Estes knew or should have known that the HVAC system was defective and would cause other portions of the building to fail prematurely, cause physical injury to the Plaintiffs, damage to the Plaintiffs' home and that Estes' employees also engaged in wrongful conduct "with the active and knowing participation of Estes' officers, directors or managers". [Ex. A, ¶¶37-40]. These allegations bring the claim squarely within the Expected or Intended Injury Exclusion. Specifically, the Expected or Intended Injury exclusion bars coverage for "'Bodily injury' or 'property damage' expected or intended from the standpoint of the insured." Based on the above allegations, Plaintiffs in the Underlying Suit plainly allege that Estes expected or intended the injuries suffered by the Plaintiffs due to their alleged conduct.

For the foregoing reasons, QBE owes no coverage to Estes for the Underlying Suit Plaintiffs' claims of negligence against it.

**vi.    There is no Coverage for Alleged Wantonness in Count I of the Underlying Suit as the Count Alleges Intentional Conduct and Expected or Intended Injury.**

Within Count I of the Underlying Suit Complaint, Plaintiffs' allege that the "Defendants' conduct also constituted wantonness in that it was so willful, wanton, reckless or wanting in care

17

that it constituted a conscious disregard or indifference to health, safety and rights of others."

[Ex. A, ¶41]. 'To establish wantonness, the plaintiff must prove that the defendant, with reckless

indifference to the consequences, consciously and intentionally did some wrongful act or omitted

some known duty ... that ... proximately cause[d] the injury of which the plaintiff complains.'

*Spain v. Brown & Williamson Tobacco Corp*. 363 F.3d 1183, 1197 (11th Cir. 2004) (quoting

*Martin v. Arnold,* 643 So. 2d 564, 567 (Ala. 1994)). Based on the above law and allegations in

the Complaint, and because wantonness requires intentional conduct, there is no accident and

therefore no "occurrence" under the Policy as to the wantonness claims.

Further, as was the case with the Plaintiffs' negligence claim, because the Complaint

alleges the Estes knew or should have known that the HVAC system was defective and would

cause other portions of the building to fail prematurely, cause physical injury to the Plaintiffs,

damage to the Plaintiffs' home and that Estes' employees also engaged in wrongful conduct "with

the active and knowing participation of Estes' officers, directors or managers", the Expected or

Intended Injury Exclusion applies to bar coverage for the Plaintiffs' wantonness claim. Based on

the above allegations, Plaintiffs in the Underlying Suit plainly assert that Estes expected or

intended the injuries suffered by the Plaintiffs due to its alleged conduct.

For the foregoing reasons, QBE owes no coverage to Estes for the Underlying Suit

Plaintiffs' claims of wantonness against it.

> **vii.    There is no Coverage for Count II of the Underlying Suit, Strict Products Liability, Because There is no Alleged "Occurrence" and Because of the Applicability of the Expected or Intended Injury Exclusion.**

In Count II of the Complaint, Plaintiffs allege strict products liability against all

defendants, presenting multiple factual allegations to support the necessary elements of a strict

products liability claim. However, most importantly with regard to QBE's coverage obligations

as to Estes, Plaintiffs' allege that "Defendants wrongful conduct, alleged in the foregoing paragraphs, was intentional and or reckless, in the Defendants' managing agents, primary owners, and/or officers or directors acted with actual or constructive knowledge of the wrongfulness of their conduct and of the high probably of injury or damage to the Plaintiffs would result and, despite that knowledge, intentionally or recklessly sold . . . an inadequate, defective and/or miss-sized HVAC system . . . ." [Ex. A, ¶54]. Plaintiffs further again allege that Estes' employees also engaged in wrongful conduct "with the active and knowing participation of Estes' officers, directors or managers" and that Estes conduct "was so willful, wanton, reckless or wanting in care that it constituted a conscious disregard or indifference to health, safety and rights of others." [Ex. A, ¶¶55-56].

Based on the above factual and legal allegations as contained in the Complaint and the law and Policy language previously cited in this brief, Count II of the Complaint does not allege an accident because only intentional conduct is alleged. Therefore, there is no alleged "occurrence" and no coverage. Furthermore, the allegations in Count II assert that Estes acted with knowledge of the high probability that injury to the Plaintiffs would result from its conduct. This allegation triggers the Expected or Intended Injury exclusion such that no coverage would be afforded even if Count II did allege an "occurrence".

For the foregoing reasons, QBE owes no coverage to Estes for the Underlying Suit Plaintiffs' claims of strict products liability against it.

### viii.   The Expected or Intended Injury Exclusion Bars Coverage for Count III of the Underling Suit, Unjust Enrichment.

Likewise, because Count III for unjust enrichment alleges only intentional conduct by Estes which was/is intended or expected to injure the Plaintiffs, there is no "occurrence" and the Expected or Intended Injury exclusion applies to bar coverage even if there were an

"occurrence". Specifically, Plaintiffs readopt their prior factual allegations regarding Estes' wrongful conduct and allege that "Defendants have continued to acquire funds and profits despite their knowledge of the defectiveness of, and risks posed by, the defective Chinese drywall and HVAC system." [Ex. A, ¶¶58-60]. In other words, Estes knows that the HVAC systems are defective, yet continues to profit from the Plaintiffs to their injury despite its knowledge that the HVAC systems pose risks to the Plaintiffs. There is no accident, thus no "occurrence", but the Expected or Intended Injury exclusion would apply even if there were an "occurrence" alleged.

For the foregoing reasons, QBE owes no coverage to Estes for the Underlying Suit Plaintiffs' claims of unjust enrichment against it.

      **ix.**    **There is no Coverage for Breach of Contract, Breach of Warranties, Violation of Unfair Trade Practices Act or Fraud Counts in the Plaintiffs' Complaint as None Allege an "Occurrence" Under the QBE Policy or Alabama Law.**

In the Complaint, Plaintiffs allege that all defendants collectively either expressly or impliedly contracted with them either directly or as third party beneficiaries. [Ex. A, ¶110]. Further, Plaintiffs allege that defendants breached these contracts by failing to provide homes suitable for human habitation and which were built within acceptable construction standards. [Ex. A, ¶111]. Also sounding in contract, Plaintiffs allege breach of an implied warranty of habitability, implied warranty of fitness for a particular purpose, implied warranty of merchantability and express warranty against Estes.

Additionally, Plaintiffs allege that the defendants, including Estes, knowingly and intentionally made false misrepresentations to them with the intent of defrauding them and also intentionally concealed or omitted material facts concerning the harmful nature of the HVAC systems with the intent that the Plaintiffs would continue to rely on the inadequate HVAC

systems. [Ex. A, ¶¶103-05, 115-18, 126-28].

Both Alabama and other jurisdictions have consistently held that breach of contract does not constitute an "occurrence" under liability policies where the policy defines an occurrence as an accident. *See Hartford, supra* (secured party's assertion of a superior security interest did not give rise to "accident" or "occurrence" within the meaning of the CGL policy); *Auto-Owners Ins. Co. v. Toole,* 947 F. Supp. 1557 (M.D. Ala. 1996) (Under Alabama law, counts of purchasers' complaint challenging insured automobile salesman's sales and financing arrangements as being unconscionable and as constituting breach of contract did not allege "occurrence" as required for coverage under insured's commercial liability and garage liability policies, and thus insurer had no duty to defend insured against those counts, where counts essentially asserted claims arising out of business dispute, albeit in context of consumer contractual transaction, and it was apparent from reading policies that they were not intended to cover business transactions and business ventures, whether of consumer nature or of another kind.); *Reliance v. Wyatt, Inc.,* 540 So. 2d 688, 691 (Ala.1988) (breach of contract is not an occurrence); *City of Burlington v. Nat'l Union Fire Ins. Co.,* 163 Vt. 124, 655 A.2d 719, 722 (1994); *Jakobson Shipyard, Inc. v. Aetna Cas. & Sur. Co.,* 961 F.2d 387, 389 (2d Cir. 1992) (no accident where insured shipbuilder provided tug boat with defective steering mechanism contrary to contract specifications); *Pace Constr. Co. v. U. S. Fid. & Guar. Ins. Co.,* 934 F.2d 177, 180 (8th Cir. 1991) (no accident where insured subcontractor breached contractual duty to procure insurance for contractor); *Magic Valley Potato Shippers v. Cont'l Ins.,* 112 Idaho 1073, 739 P.2d 372, 375-76 (1987) (no accident where buyer failed to pay for and pick up goods in violation of existing contract).

Further, certain exclusions apply to bar coverage for claims of "bodily injury" and "property damage" assumed by the Insured in contract and for warranties associated with the

Insured's work. Specifically, the QBE Policy contains a Contractual Liability exclusion which states that this insurance does not apply to: "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement." [Ex. F]. Additionally, the Damage to "Your Work" exclusion precludes coverage for warranties as fully discussed in the section of this brief immediately below.

Two recent cases from the Federal District Courts in Alabama, *Assurance Company of America v. Admiral Insurance Company*, Civil Action No. 10-0117-GC-C, 2011 WL 1897589 (S.D. Ala., May 18, 2011) (Granade, J.) and *Hermitage Insurance Company v. Champion*, Civil Action No. 2:09cv398-MHT, 2010 WL 1711049 (M.D. Ala., April 27, 2010) (Thompson, J.), are instructive as to how the courts handle demands for defense and indemnification under Complaints and facts involving construction defect cases such as the instant case where breach of contract, breach of warranties and fraud are alleged against contractors.

In *Assurance*, this Court reviewed coverage for Byrd Homes, Inc. ("Byrd Homes") under a CGL policy issued it by Scottsdale Insurance Company ("Scottsdale"). 2011 WL1897589 at *1. In that case, Scottsdale denied a defense to Byrd Homes for an underlying lawsuit brought by a homeowner who had hired Byrd Homes to build a custom home for him. *Id*. Specifically, the homeowner sued Byrd Homes alleging breach of contract, breach of the implied warranty of habitability, breach of implied warranty of fitness and fraud in connection with allegedly defective construction of the home. *Id.* Taking one count at a time, this Court first held that there was no coverage for Byrd Homes pursuant to the fraud claim under the Scottsdale Policy because there was no "occurrence". *Id.* at *5. Specifically stated, "fraudulent misrepresentation cannot be considered an 'occurrence' involving accidental injury or property damage." *Id.* Next, this Court held that coverage was excluded by the contractual liability exclusion for all claims

sounding in contract, including breach of warranty. *Id.* at *8.

Likewise, in *Champion*, Judge Myron Thompson in the Middle District of Alabama found no coverage for a homeowner, Champion, or general contractor, Gallops Home Builders, LLC ("Gallops"), as against Gallops' commercial general liability carrier, Hermitage Insurance Company ("Hermitage"), for claims of breach of contract, negligence, breach of warranty of habitability, breach of warranty, and fraud incident to the construction of a new, custom home. 2010 WL 1711049. Specifically, Gallops was hired by Champion to build a custom home and was ultimately sued by Champion when foundation problems developed causing damage throughout the home. *Id.* at *1.

When Gallops presented the lawsuit to Hermitage for defense, Hermitage denied coverage and refused to defend it in Champions' underlying lawsuit in state court. *Id.* at *2. Hermitage took the position that the injuries as alleged by Champion were not caused by an "occurrence" and that certain policy exclusions applied to bar coverage. *Id.* Taking each count in turn, Judge Thompson agreed that there was no coverage for Gallops under the Hermitage Policy. *Id.* at *3-5. As to the claims sounding in contract, foregoing a discussion on whether those contract claims even constituted an "occurrence", the court held that the contractual liability exclusion, containing language identical to that in the QBE Policy, clearly barred coverage for Champion's breach of contract, breach of warranty of habitability and breach of warranty claims. *Id.* at *3-4. Further, regarding the fraud claims, the court quoted its prior decision and the Eleventh Circuit's affirmance in *Thorn v. American States Ins. Co.*, 266 F. Supp. 2d 1346 (M.D. Ala. 2002) (Thompson, J.) *aff'd*, 66 Fed. Appx. 846 (11th Cir. 2003), for its holding that fraud, whether intentional or negligent, is not an "occurrence". In *Thorn*:

> The court stated that extending coverage to fraud claims would be improper
> because "the policy … was clearly designed to protect the plaintiffs from liability

23

> for essentially accidental injury to another person, or property damage to another's possessions" *Id.* at 1352. The court explained that, "To allow coverage here would have the effect of transforming [the insurance company] into 'a sort of silent business partner' to the consumer transactions between the [] plaintiff and [the defendant]." *Id.* at 1352. (quotation and citation omitted), and "[t]his would cause an 'enormous' expansion of the scope of the insurer's liability without corresponding compensation," *id. ; Auto-Owners Ins. Co. v. Toole,* 947 F.Supp. 1557, 1564 (M.D. Ala. 1996) (Thompson, C.J.) ("this court would distort the purpose of the liability insurance policies in this case by applying them to the consumer transactions").

266 F. Supp. 2d at 1352. Based on the foregoing, the *Champion* Court held that the insurer had no duty to defend its insured contractor for claims of breach of contract, breach of warranties and fraud in said construction defect case.

Finally, even if the fraud counts did allege an "occurrence", coverage for the same would still be excluded by the Expected or Intended Injury exclusion. Again, the allegations in the Complaint only assert intentional actions by Estes which were specifically intended to injure the Plaintiffs. Therefore, the QBE Policy provides no coverage for Estes as to the Fraud Counts and QBE has no duty to defend Estes for the same.

Based on the above, and as most recently set forth by this Court in *Assurance*, QBE owes no duty to defend or indemnify Estes for Count IX (Breach of Contract), Count IV (Implied Warranty of Habitability), Count V (Implied Warranty of Fitness for a Particular Purpose), Count VI (Implied Warranty of Merchantability) or Count VII (Express Warranty) because there is no alleged "occurrence" and because of the applicability of the contractual liability exclusion as all these claims sound in contract. Further, QBE owes no duty to defend or indemnify Estes for Count VIII (Violation of Alabama's Deceptive and Unfair Trade Practices Act), Count X (Fraudulent Misrepresentation and Count XI (Fraudulent Concealment/Suppression) as those counts do not allege an "occurrence" and/or would be barred by the Expected or Intended Injury exclusion.

x.   **The Damage to "Your Work" Exclusion Also Bars Coverage for Counts, IV-VII of the Underlying Suit Alleging Breaches of Implied and Express Warranties.**

Further, regarding counts alleging breach of warranty, the Damage to "Your Work" exclusion specifically bars coverage for any alleged warranties for the work done by Estes. That exclusion states that the insurance does not apply as follows:

l.   Damage to Your Work
        "Property Damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".
        This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

Under the Policy, the definition of "your work" includes: "Warranties or representations made any time with respect to fitness, quality, durability, performance or use of "your work" or "your product". It is apparent that this exclusion was meant to bar coverage for claims of breach of warranties made by Estes in conjunction with its normal operations as long as those operations were completed as described in the "products completed operations hazard" and were not performed by a subcontractor. In this instance, the Complaint alleges and the facts show that the installation of the HVAC systems was done entirely by Estes' employees and the HVAC systems started having problems after the installations had been completed.

Returning to *Champion*, that Court quickly disposed of the coverage question regarding the breach of warranty claims via application of the Damage to "Your Work" exclusion stating, "the Hermitage policy does not apply to 'warranties or representations made at any time with respect to the fitness, quality durability, performance or use of 'your work.'" 2010 WL 1711049 at *4. Coverage for breach of warranties was therefore excluded. *Id.* QBE's Policy contains the same exculpatory language as the Hermitage policy with regard to warranties. Therefore, the Damage to "Your Work" exclusion applies to bar coverage for all claims of breach of warranty,

both express and implied, and QBE owes no duty to defend or indemnify Estes for said claims.

> **xi.** **There is no Coverage for Count XII, Failure to Secure a Performance Bond, Because there is no Alleged "Property Damage". Further, there is no Coverage for Certain Damages Alleged in the Underlying Suit as they Constitute Purely Economic Damages and are not "Bodily Injury" or "Property Damage".**

The twelfth cause of action as added to the Plaintiffs' Complaint alleges that the defendants failed to comply with Alabama Code §39-1-1 which requires entities that contract with an awarding public authority for the performance of public works to procure a performance bond with the penalty being 100% of the contract amount. [Ex. A, ¶132]. Plaintiffs allege that because the Defendants did not execute the required performance bonds, they cannot levy claims against those bonds which they would have been entitled to do. [Ex. A, ¶134].

Under the Policy, there is only coverage for "bodily injury" or "property damage" caused by an "occurrence." "Bodily injury" is defined as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." Further, "property damage" is defined as "a. physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or b. loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it." [Ex. F].

Clearly, there is no allegation of "bodily injury" in Count Twelve. The alleged injury to the Plaintiffs under this Count relates strictly to the loss of their ability to file a claim against a surety bond that was to have been procured by the defendants. Therefore, the only way there could be coverage for Estes under this Count is if there is "property damage" alleged. The question then is whether the loss of the Plaintiffs' ability to file a claim under the code section is "property damage" to tangible property.

In *Prince v. Higgins,* 572 So. 2d 1217 (Ala. 1990), the Alabama Supreme Court accepted the following definitions of "tangible property" and "intangible property":

> "Tangible property is that which may be felt or touched; such property as may be seen, weighed, measured, and estimated by the physical senses; that which is visible and corporeal; having substance and body as contrasted with incorporeal property rights such as franchises, choices in action, copyrights, the circulation of a newspaper, annuities and the like.  Tangible property must necessarily be corporeal, but it may be either real or personal."
>
> "Intangible property is property which has no intrinsic and marketable value, but is merely the representative or evidence of value, such as certificates of stock, bonds, promissory notes, and franchises. Intangible property is held secretly; that is, it cannot be readily located, and there is no method by which its existence or ownership can be ascertained in the state of its situs, except, perhaps, in the case of mortgages or shares of stock. The value of intangible property is not easily ascertained."

572 So. 2d at 1219.

In this context, tangible property is property that is capable of being handled, touched or physically possessed. Purely economic losses are not included in this definition. *Oxford Lumber Co. v. Lumbermen's Mut. Ins. Co.,* 472 So. 2d 973 (Ala. 1985) (employee's claim for insured's failure to provide medical benefits not covered); *Keating v. National Union Fire Ins. Co. of Pittsburgh,* 995 F.2d 154 (9th Cir. 1993) (economic loss is not damage or injury to tangible property covered by a comprehensive general liability policy); *Allstate Ins. Co. v. Russo,* 829 F.Sup.24 (D.R.I. 1993) (lost investments and lost deposits not tangible property): *Graber v. State Farm Fire & Case. Co.,* 244 Mont. 265, 797 P.2d 214 (1990) (lost business and injury to reputation and goodwill are not damage to tangible property under a business owner's policy); *Travelers Indem. Co. v. State,* 140 Ariz. 194, 680 P.2d 1255 (Ariz. App. 1984) (loss of investment represented by an investment certificate not a loss of tangible property); *L. Ray Packing Co. v. Commercial Union Ins. Co.,* 469 A.2d 832 (Me. 1983) (antitrust action claiming loss of profits and financial interests resulting from insured's alleged price-fixing scheme not

covered).

Similarly, the Alabama Supreme Court held in *American States Insurance Company v. Martin,* 662 So. 2d 245 (Ala. 1995) that strictly economic losses like lost profits, loss of an anticipated benefit of a bargain, and loss of an investment, do not constitute damage or injury to "tangible" property. The language used in the American States policy is nearly identical to that of QBE's Policy and is based upon the assumption that tangible property, unlike an economic interest, is generally subject to physical damage or destruction. As the Alabama Supreme Court found in *American States, supra*, here there is no coverage for Estes because there is no damage to "tangible property" under the definitions within the Policy and/or bodily injuries, and such damage is necessary to bring such claims within the Policy coverage. *See American States, supra; citing Reliance Ins. Co. v. Gary C. Wyatt, Inc.,* 540 So. 2d 688 (Ala. 1988); *Warwick, supra*; *Oxford Lumber, supra.*

Based on the foregoing law, there is no coverage afforded Estes for Count Twelve in the Complaint because there is no covered "bodily injury" or "property damage" alleged in that count. The loss of the ability to levy a claim under statutory authority that provides for a penalty of the purely economic recovery of 100% of the contract price is not an allegation of damage to tangible property and the loss is purely economic in nature.

Additionally, review of the Underlying Suit Complaint indicates that, while certain damages as alleged in the Complaint would constitute "property damage" and/or "bodily injury" under the QBE Policy, others do not. Specifically, based upon the foregoing law, the QBE Policy does not afford coverage for increased utility and servicing costs, past and future lost earnings, diminished values of their homes, loss of marketability of their homes, relocation expenses and costs, cleaning expenses and costs, loss of financial and time investment in homes and loss of

rents, loan interest and equity. Those losses are purely economic losses and/or are not tangible property which would fall within the definition of "property damage" within the Policy.

### xii. Count XIII of the Underlying Suit for Failure to Comply with the Alabama Residential Landlord-Tenant Act only Contains Allegations Against the Prichard Housing Authority, and thus no Coverage Applies to Estes.

The Fifth Amended Complaint in the *Henderson* portion of the Underlying Suit contains one additional count, Count XIII, for Failure to Comply with the Alabama Residential Landlord-Tenant Act. A cursory review of this count reveals that the only allegations made by the Plaintiffs are claims against the Prichard Housing Authority, and not as to all defendants collectively as the prior counts had been. Therefore, because there are no allegations made against Estes in this count, likewise there is no duty to defend or indemnify Estes triggered under the QBE Policy based on said allegations.

### xiii. Duty to Indemnify

In its Declaratory Judgment Complaint brought pursuant to the Declaratory Judgment Act, 28. U.S.C. § 2201, QBE has requested this Court determine its duties to both defend and indemnify Estes. [See Declaratory Judgment Complaint, attached hereto as Exhibit "I", p. 17]. As stated above, the Underlying Suit has not concluded and has in fact been stayed by the Circuit Court of Mobile County. [Ex. H]. As such, Estes' ultimate liability or lack thereof to the Underlying Suit Plaintiffs has not been adjudicated.

While QBE requests this Court to declare its rights and obligations as to its duty to indemnify Estes at this time, QBE does so make this request with the full understanding that it is within this Court's discretion to refrain from doing so based upon ripeness of the issue. *See Essex, supra* ("Any discussion of the duty to indemnify would be premature . . . given the lack of any final adjudication of the Underlying Action.").

Based on the above, QBE requests that this Court exercise its discretion and declare and decree that it has no duty to indemnify Estes for the allegations in the Underlying Suit Complaint, however, should the Court decide the issue is premature, QBE requests any such other relief as to its duty to indemnify Estes as the Court deems appropriate such that QBE may preserve its right to litigate this issue if and when it becomes ripe, including, but not limited to, a dismissal of the issue without prejudice.

**B.     Conclusion**

QBE believes and avers that the Underlying Suit is not covered by and/or is excluded from coverage under the CGL Policy.  QBE avers that no coverage is afforded to the Estes for this loss based upon the lack of an "occurrence" as to the work performed by Estes and the applicability of certain exclusions in the QBE Policy including the Total Pollution, Expected or Intended Injury, Contractual Liability, and Damage to "Your Work" exclusions.

**WHEREFORE, THE ABOVE PREMISES CONSIDERED**, QBE prays that this Honorable Court:

A.     Declare and decree that under the CGL Policy QBE Insurance Corporation does not owe a duty to defend Estes Heating & Air Conditioning, Inc. with regard to the Underlying Suit;

B.     Declare and decree that under the CGL Policy QBE Insurance Corporation does not owe a duty to indemnify Estes Heating & Air Conditioning, Inc. with regard to the Underlying Suit;

C.     Afford QBE such other and further relief as the Court may deem proper.

Respectfully submitted,

*/s/ Michael W. Kelley, II*
Thomas T. Gallion, III (ASB-5295-L74T)
Michael W. Kelley, II (ASB-7825-I25K)
Attorneys for QBE Insurance Corporation


OF COUNSEL:

Thomas T. Gallion, III
Michael W. Kelley, II
HASKELL SLAUGHTER YOUNG & GALLION, LLC
Post Office  Box 4660
Montgomery, Alabama 36103-4660
Telephone:     (334) 265-8573
Facsimile:      (334) 264-7945


**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing document has been served upon the following by placing a copy of the same in the United States mail, postage prepaid and properly addressed, on this the 29th day of September, 2011.

Thomas M. Galloway, Jr.
Post Office Box 16629
Mobile, Alabama   36616
TEL:  (251) 476-4493


*/s/Michael W. Kelley, II*
OF COUNSEL

02391-1123
372510_1

31