IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| QBE INSURANCE CORPORATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 10-456-CG-N |
| | ) |
| ESTES HEATING & AIR | ) |
| CONDITIONING, INC., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

This matter is before the court on plaintiff's motion for summary judgment (Doc. 23), and defendant's opposition thereto (Doc. 27). For the reasons explained below, the court finds that the injuries alleged in the underlying suits were caused by an "occurrence" as defined by the policy at issue. However, the court finds that the claims are barred by the pollution exclusion contained in the policy. Therefore, plaintiff's motion for summary judgment will be granted.

## FACTS

Plaintiff, QBE Insurance Corporation ("QBE") filed this action seeking a declaration that it owes no coverage under the Commercial General Liability Policy issued to Estes Heating & Air Conditioning, Inc. ("Estes") for certain claims presented in two lawsuits filed in the Circuit Court of Mobile County, Alabama against Estes and other entities that are not parties in this action. (Doc. 1). The claims in the underlying suits arise from the construction of residential housing in a housing project in Prichard, Alabama called the Bessemer Subdivision. (Doc. 23-4).

1

On January 17, 2006, Estes was retained as an HVAC subcontractor to install HVAC systems at the Bessemer Subdivision. (Doc. 23-4, ¶¶ 6-7).

The underlying lawsuits allege that the plaintiffs' are tenants or residents in the homes in question and were injured by exposure to gases emitted from Chinese drywall used in construction of the homes. The plaintiffs allegedly suffered both personal injuries and property damage. The lawsuits allege that their injuries were directly and proximately caused, exacerbated and worsened by the HVAC systems which were installed by Estes. The underlying suits assert claims for (1) negligence and wantonness, (2) strict products liability, (3) unjust enrichment, (4) implied warranty of habitability, (5) implied warranty of fitness for a particular purpose, (6) implied warranty of merchantability, (7) express warranty, (8) violation of Alabama's Deceptive and Unfair Trade Practices Act, (9) breach of contract, (10) fraudulent misrepresentation, (11) fraudulent concealment/ suppression, (12) failure to secure performance bond, and (13) failure to comply with the Alabama Residential Landlord-Tenant Act.

Under the subcontract agreement, Estes was to install the HVAC systems in strict compliance with the plans and specifications provided to Estes, which Estes reportedly did. (Doc. 23-4, ¶¶ 9-10). Estes did no calculations of its own as to the appropriate HVAC systems to be installed. (Doc. 23-4, ¶ 10). The HVAC systems installed by Estes were inspected by city officials and passed inspection. (Doc. 23-4, ¶ 11).

QBE issued a commercial general liability insurance policy bearing policy no. ANMI9903-6, effective November 29, 2008 through November 29, 2009 to Estes. The language contained in the policy will be quoted and discussed below as necessary.

## DISCUSSION

**A. Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted: "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" Bailey v. Allgas, Inc., 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting Anderson, 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, at 249-250. (internal citations omitted).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." See Anderson, 477 U.S. at 251-252.  The moving party bears the burden of proving that no genuine issue of material fact exists. O'Ferrell v. United States, 253 F.3d 1257, 1265 (11th Cir. 2001).  In evaluating the argument of the moving party, the

3

court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999).  "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir. 1992) (citing Mercantile Bank & Trust v. Fidelity & Deposit Co., 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 524 (11th Cir. 1994)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)).  Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment."  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  The non-moving party "may not rest on the mere allegations or denials of the [non-moving] party's pleading, but .... must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e)  "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted). "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." Tipton v. Bergrohr GMBH-

4

Siegen, 965 F.2d 994, 998 (11th Cir. 1992).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 at 587 (1986) (internal quotation and citation omitted).

**B.  Coverage Under The Policy**

QBE contends that it has no obligation under the policy of insurance to defend or indemnify Estes with regard to the underlying lawsuits. "In Alabama, insurers have the right, absent statutory provisions to the contrary, to limit their liability and write policies with narrow coverage." Turner v. U.S. Fidelity and Guar. Co.,  440 So.2d 1026, 1027 -1028 (Ala. 1983) (citation omitted).  Under Alabama law, the insured bears the burden of establishing coverage by demonstrating that a claim falls within the policy, see Colonial Life & Accident Ins. Co. v. Collins, 280 Ala. 373, 194 So.2d 532, 535 (1967), while the insurer bears the burden of proving the applicability of any policy exclusion. See U.S. Fidelity & Guar. Co. v. Armstrong, 479 So.2d 1164, 1168 (Ala. 1985).   If an insurance policy is ambiguous in its terms, the policy must be construed liberally in favor of the insured, and exceptions to coverage must be interpreted as narrowly as possible in order to provide maximum coverage to the insured. Altiere v. Blue Cross & Blue Shield, 551 So.2d 290, 292 (Ala. 1989).  The court notes that an "insurer's duty to defend is more extensive than its duty to [indemnify]."  Porterfield v. Audubon Indem. Co.,  856 So.2d 789, 791 (Ala. 2002)

5

(quoting United States Fid. & Guar. Co. v. Armstrong, 479 So.2d 1164, 1168 (Ala. 1985)).  Generally, an insurer's obligations with respect to providing a defense to its insured in an action brought by a third-party are determined by the allegations contained in the third-party's complaint. Ladner and Company, Inc. v. Southern Guaranty Ins. Co., 347 So.2d 100, 102 (Ala. 1977) (citations omitted).  "If the allegations of the injured party's complaint show an accident or occurrence which comes within the coverage of the policy, the insurer is obligated to defend regardless of the ultimate liability of the insured." Id. (citing Goldberg v. Lumber Mutual Casualty Ins. Co., 297 N.Y. 148, 77 N.E.2d 131 (1948)).  Thus, if there is any potential for coverage arising out of the allegations, then QBE would have at least a duty to defend.

> However, a court is not constrained to consider only the allegations of the underlying complaint, but may additionally look to facts which may be proved by admissible evidence. Tanner [v. State Farm Fire & Cas. Co., 874 So.2d 1058, 1064 (Ala.2003)]; see also Hartford Cas. Ins. Co. v. Merchants & Farmers Bank, 928 So.2d 1006, 1010 (Ala.2005) (in deciding whether the allegations of the complaint show a covered accident or occurrence, "the court is not limited to the bare allegations of the complaint ... but may look to facts which may be proved by admissible evidence") (citations omitted). The test, ultimately, is this: "The insurer owes no duty to defend only if neither does the complaint against the insured allege a covered accident or occurrence nor does the evidence in the litigation between insurer and insured prove a covered accident or occurrence." Tanner, 874 So.2d at 1065.

Essex Ins. Co. v. Foley, 2011 WL 1706214, *3 (S.D. Ala. May 5, 2011).  If both covered claims and non-covered claims are pleaded, then the insurer's duty to defend extends at least to those covered claims. Tanner, 875 So.2d at 1065.

6

QBE asserts that summary judgment should be granted in its favor because (1) there has been no "occurrence" under the policy; (2) the "total pollution" exclusion bars coverage; (3) the "expected or intended injury" exclusion bars coverage for the strict products liability claim and the unjust enrichment claim; (4) there is no coverage for breach of contract, breach of warranties, violation of Unfair Trade Practices Act or fraud; (5) the "damage to your work" exclusion bars coverage for breach of implied and express warranties; (6) there is no coverage for purely economic damages; and (7) the last claim for failure to comply with the Alabama Residential Landlord-Tenant Act is not asserted against Estes.

**1. Occurrence**

QBE contends that damages alleged in the underlying lawsuits do not constitute an "occurrence" as required by the policy.  The policy states that it applies to "bodily injury" and "property damage" only if the "bodily injury" or "property damage" is caused by an "occurrence."   The policy defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Doc. 1-3, p. 53). What constitutes an "accident" is not defined by the policy.  Where an insurance policy defines certain words or phrases, a court must defer to the definition provided by the policy. <u>Twin City Fire Ins. Co. v. Alfa Mut. Ins. Co.</u>, 817 So.2d 687 (Ala. 2001).   However, because the instant policy does not define "accident,"  we look outside the policy for the meaning of the word.  Black's Law Dictionary defines "accident" as "[a]n unintended and unforeseen injurious occurrence;

something that does not occur in the usual course of events or that could not be reasonably anticipated." Black's Law Dictionary 15 (7th ed. 1999). "Accident" has also been defined as "an unexpected happening rather than one occurring through intentional design or an event which takes place without one's foresight or expectation or design." Liberty Mut. Ins. Co. v. Wheelwright Trucking Co., Inc., 851 So.2d 466, 480 (Ala. 2002) (citations and internal quotations omitted).

     QBE contends that no accident occurred during Estes' performance. However, the underlying lawsuits allege that the plaintiffs were injured by gases emitted from the Chinese drywall as a direct and proximate result of the HVAC system which was installed by Estes. QBE points out that some of the claims are vague and do not allege specific conduct by Estes or explain how Estes' performance was negligent or faulty. Estes is alleged to have installed undersized HVAC units which worsened the plaintiffs' exposure to harmful conditions. Estes denies that the HVAC units were undersized and asserts that it relied on the plans and specifications that were provided. Both QBE and Estes contend that Estes did not err in any way and merely performed according to the project specifications as it had contracted to do. However, Estes' ultimate liability is not before this court. The court must look only at whether the claims, if proved, would fall within the policy coverage.

     QBE asserts that the claimed injuries did not result from an accident, but from Estes' intended actions of installing the HVAC systems. The underlying complaints include allegations that the defendants knew or should have known the defective

8

nature of the drywall and the HVAC system and that their wrongful conduct was intentional and/or reckless.  However, Estes' liability is not dependent on its conduct being intentional.  While Estes intentionally installed the HVAC system, there has been no evidence presented that Estes intended the drywall gases to cause injury or for the HVAC system to worsen the plaintiffs' exposure to any potential irritant or contaminant.  Under the facts presented to this court, Estes' conduct was at most negligent.   "[T]he term 'accident' does not necessarily exclude human fault called negligence." United States Fidelity and Guar. Co. v. Bonitz Insulation Co. of Alabama, 424 So.2d 569, 571 (Ala. 1982).  The Bonitz Court held that because Bonitz was "merely charged with negligence in installing the roof, there is no evidence that they either expected or intended the roof to start leaking" and therefore, the injury satisfied the requirement of an "occurrence."  Id.

   Likewise, in Moss, a roofer was sued for water damage which occurred while a roof was being replaced. Moss v. Champion Ins. Co.,  442 So.2d 26 (Ala. 1983).  The Court stated that it is clear from our cases that the term "accident" in such a policy does not necessarily exclude human fault called negligence. Id. at 28 (citing Bonitz supra).  The Court held that while the roof was indeed intentionally removed, the resulting water damage was not intended, and, therefore, that there was an "occurrence" within the general liability policy terms.  Accordingly, the court finds that the underlying complaints clearly allege that bodily injury and property damage were caused by an occurrence as defined under the policy.

9

**2. Total Pollution Exclusion**

QBE asserts that the Total Pollution Exclusion Endorsement bars coverage of all claims. The pollution exclusion in the policy states that the insurance does not apply to:

> f. Pollution
> (1) "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.
>
> (2) Any loss, cost or expense arising out of any:
>     (a) Request, demand, order or stationary or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or
>     (b) Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

(Doc. 1-3, p. 55). There is no consensus among the states as to the scope of this and similar pollution exclusions. In fact, the Supreme Court of Alabama has described the dispute over their application as "not just a split in authority, but an absolute fragmentation of authority." Porterfield v. Audubon Indem. Co., 856 So.2d 789, 800 (Ala. 2002).

In its response to summary judgment, Estes does not dispute that the gases from the drywall qualify as a "pollutant"; nor, does Estes dispute that the gases were discharged, dispersed, seeped, migrated, released or escaped as specified in the exclusion. Instead, Estes contends that the exclusion does not apply because Estes was not a polluter itself, in that it did not manufacture or install or have anything to do with the drywall from which the gases were emitted. In support of its contention, Estes cites In re Idleaire Technologies Corp., 2009 WL 413117 (Bkrtcy D. Del. Feb. 18, 2009). The Idleaire case found that the exclusion did not apply because of the

10

"Reasonable Expectations" Doctrine." Id. at *7.  The court found that because the insured did not create or produce the pollution and did not store, use or handle any substances that could constitute pollutants it could not have been reasonably expected that the claims would be barred under the pollution exclusions. Id.  However, the Idleaire decision was based on Tennessee law and is clearly not controlling here.

The court is aware of no cases in Alabama that distinguish between pollution created by the insured and pollution created by a third party.  Courts in Alabama have found coverage was excluded by a pollution exclusion under circumstances where the insured was not a polluter.  For instance in Maxine Furs, Inc. v. Auto-Owners Ins. Co., the Eleventh Circuit, applying Alabama law, found the pollution clause in that case barred coverage where fumes from a neighboring restaurant which shared air-conditioning ducts with the insured, a fur shop, resulted in the insured having to clean its furs because they smelled like curry.  Maxine Furs, 426 Fed.Appx. 687, 687, 2011 WL 1197466, *1 (11th Cir. March 31, 2011).  The pollution exclusion in Maxine Furs is similar to the exclusion in the instant case and is described as excluding from coverage "any damage or loss caused by 'discharge, dispersal, seepage, migration, release or escape of 'pollutants.' " Id. at 687.

However, QBE acknowledges that Alabama is included in the group of states that have generally limited pollution exclusions to situations involving traditional environmental pollution either because they find that the exclusion is ambiguous or because they find that the exclusion contradicts policyholders' reasonable expectations. (Doc. 23-2, pp 13-14).  QBE contends however that Alabama has deviated from that traditional notion, citing Shalimar Contractors, Inc. v. American States Insurance Co., 975 F.Supp.2d 1450 (M.D. Ala. 1997).  The Supreme Court of Alabama explained the circumstances of Shalimar as follows:

> In that case, the insured, Shalimar Contractors, Inc., had performed lead-abatement work in an apartment building in the same MHA housing project involved in this case, Riverside Heights. A mother and her two young sons, who had resided in one of the apartments, sued

11

Shalimar, alleging that it had temporarily left debris containing lead on the porch beside their apartment unit and had temporarily discarded, out in the open, lead-contaminated clothing worn by its workers. The plaintiffs alleged that, as a result, they had been exposed to lead and were suffering from lead poisoning. Shalimar's insurer denied coverage, relying on the absolute pollution-exclusion clause in its policy. Although Shalimar, in the collateral declaratory-judgment action it brought in federal district court, specifically cited only the exclusion provisions corresponding to those in the Audubon policy labeled II.f.(1)(b) and (c) and II.f.(2), the court noted that provision II.f.(1)(d)(ii) was "equally pertinent." The court took note of Molton, Allen & Williams, Armstrong, and Alabama Plating, but concluded that the qualified pollution-exclusion clauses involved in those cases were markedly different from the absolute pollution-exclusion clause at issue, which the court found to be "far more developed and specific than the abrupt language" in the qualified pollution-exclusion clause. 975 F.Supp. at 1456. The court further noted that, unlike the qualified clause, the absolute clause "makes no reference to whether the release was into or upon land, the atmosphere, or water, or whether the release was sudden, accidental, or gradual in nature." 975 F.Supp. at 1456. After noting that "Shalimar does not contend that any specific terms of the pollution exclusion are ambiguous," and was not contending "that it did not handle, store, or dispose of the lead contaminated materials alleged to have caused the ... children's injuries," 975 F.Supp. at 1455, the court stated that "absent any evidence or argument that the language in this particular exclusion is ambiguous, [Shalimar's] argument that the present exclusion should be limited to intentional pollution of the environment at large is without merit." 975 F.Supp. at 1456. The court pointed out that Shalimar "offers no contention that any word or phrases in this exclusion could be reasonably interpreted by people of ordinary intelligence to have two contradictory meanings" and that "[a]ccordingly the court [found] that the language in the exclusion [was] not ambiguous and that a person of ordinary intelligence would interpret the language according to its plain meaning, that any bodily injury resulting from the release or escape of pollutants as a result of Shalimar's handling or storage of waste or from any location occupied by Shalimar would not be covered under the insurance contract." 975 F.Supp. at 1456-57 (footnote omitted).
Under the facts before it, the Shalimar court declined to follow the holdings of cases from other jurisdictions that found that the terms "discharge, dispersal, release, and escape are environmental terms of art," agreeing instead with the reasoning in United States Liability

12

> Insurance Co. v. Bourbeau, 49 F.3d 786, 788 (1st Cir.1995), that coverage would be excluded for "contamination of property caused by the removal and discharge of lead paint chips." 975 F.Supp. at 1458. The court emphasized that "Shalimar does not contend that [it] did not handle, store, or transport the lead bearing waste" and, consequently, found the facts to be that "Shalimar was handling, storing, and transporting pollutants in the form of waste contaminated with lead in connection with the lead abatement work being carried out at the Riverside Heights Housing Project." 975 F.Supp. at 1458.

Porterfield, 856 So.2d at 797-798.   Thus, the Shalimar case found that the pollution exclusion in that case was not ambiguous and did not require that the pollution be environmental in nature. [1]

---

[1] The pollution clause at issue in Shalimar included the following:
> (1) "Bodily injury" or "property damage" arising out of the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of pollutants:
> \* \* \* \*
> > (b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;
> > (c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any insured or any person or organization for whom you may be legally responsible; or
> > (d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations:
> > \* \* \* \*
> > > (ii) if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize, or in any way respond to, or assess the effects of pollutants....
>
> (2) Any loss, cost, or expense arising out of any:
> > (a) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effect of pollutants; or  …

13

Similarly, in Maxine Furs, discussed above, the Eleventh Circuit found that the pollution exclusion was not ambiguous and thus, should be enforced as written. Maxine Furs, 426 Fed.Appx. at 688. The policy defined "pollutant" as: "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." Id. at 687-688. The court found that curry aroma was a "contaminant" since it soiled Maxine's furs. Id. Accordingly, the court found that the curry was a pollutant under the policy and that the claim was excluded from coverage. Id.

In the instant case, the policy defines "pollutant" as follows:

> "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled reconditions or reclaimed.

(Doc. 1-3, p. 53). The gas emitted from the drywall clearly qualifies as a "pollutant" under this definition. Under the clear language of the policy, the gas emitted from the drywall is a pollutant that allegedly caused damage when it was discharged, dispersed, seeped, migrated or was released. Accordingly, the court finds that under the unambiguous language of the policy the claims in this case are excluded from coverage.

Moreover, as noted above, Estes has not even asserted that the policy is ambiguous or disputed that under the policy the gases from the drywall qualify as a "pollutant" or that the gases were discharged, dispersed, seeped, migrated, released or escaped as specified in the exclusion. Estes' only opposition to the application of the pollution exclusion was that Estes was not the polluter. However, neither Alabama law; nor, the language of the policy makes such a distinction. Since all of the damages in the underlying suits that could be caused by an "occurrence" arise from the

---

Shalimar, at 1453. The court determined that subsections (1)(b), (1)(c), (1)(d)(ii) and (2) applied to the facts of that case.

14

"discharge, dispersal, seepage, migration release or escape" of a "pollutant", the court finds that the policy excludes coverage of all of the claims asserted against Estes in the underlying suit.  As such, the court declines to discuss the additional exclusions under which plaintiff asserts some of the claims are barred.

## **CONCLUSION**

For the reasons stated above, the motion of QBE Insurance Co. for summary judgment (Doc. 23) is **GRANTED.**

**DONE and ORDERED** this 8th day of February, 2012.

/s/  Callie V. S. Granade
UNITED STATES DISTRICT JUDGE